UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARIO ZEGARRA, | ) | |
| | ) | |
| Plaintiff, | ) | 15 C 1060 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| JOHN CRANE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

Mario Zegarra brought this suit against his former employer, John Crane, Inc. ("JCI"),

alleging race, color, and national origin discrimination in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., age discrimination in violation of the Age

Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq*., and retaliation

for complaining about the discriminatory denial of overtime. Doc. 1. Discovery is closed and a

jury trial is set for February 6, 2017. Doc. 58. JCI has moved for summary judgment on all

claims. Doc. 51. The motion is granted.

**Background**

JCI filed its summary judgment motion on March 18, 2016. *Ibid*. At Zegarra's request,

the court set a very generous briefing schedule, with his response not due until June 13, 2016,

nearly three months later. Doc. 57. On June 10, Zegarra moved to extend the deadline, Doc. 59,

and the court extended the deadline to July 11, Doc. 61. On July 11, Zegarra moved for a further

extension to August 12. Doc. 62. The next day, the court denied the motion for failure to

comply with Local Rule 5.3(b), but on its own motion extended the deadline to July 21. Doc. 65.

The order noted: "Given the extremely generous original briefing schedule …, the 28-day

extension already given to Plaintiff …, and the impending pretrial and trial dates …, if Plaintiff does not respond to the summary judgment motion by 7/21/2016, the court will treat the motion as having been submitted and will rule forthwith." *Ibid*. The court amended that order on July 13 as follows: "The 7/12/2016 order … is amended to state that [i]f Plaintiff responds to the summary judgment motion by 7/21/2016, Defendant shall reply by 8/4/2016." Doc. 66.

On July 20, Zegarra filed an "emergency motion to modify the July 12, 2016 order based on new extenuating circumstances." Doc. 67. The motion asserted that due to an email error, Zegarra's counsel did not see the July 12 order until July 19. *Id*. at ¶¶ 5-6. The court denied Zegarra's motion, noting that it did "not assert or even suggest that Plaintiff's counsel did not see the 7/13/2016 order … when it was issued"; that the July 13 order "highlighted the existence of the 7/12/2016 order and, in particular, explicitly referenced the 7/21/2016 due date for Plaintiff's response to Defendant's summary judgment motion"; and that Zegarra had not been deprived of an opportunity to respond to JCI's summary judgment motion, because "all told, he was given over four months to respond …." Doc. 69. Zegarra did not respond to JCI's summary judgment motion by July 21, so JCI's motion is ready for decision. *See Flint v. City of Belvidere*, 791 F.3d 764, 768 (7th Cir. 2015) ("[C]ase management depends on enforceable deadlines …. In managing their caseloads, district courts are entitled to—indeed they must—enforce deadlines.") (internal quotation marks omitted); *Raymond v. Ameritech Corp.*, 442 F.3d 600, 605 (7th Cir. 2006) ("Rule 6(b) … clearly gives courts both the authority to establish deadlines and the discretion to enforce them."); *Reales v. Consol. Rail Corp.*, 84 F.3d 993, 996 (7th Cir. 1996) ("The district courts must manage a burgeoning caseload, and they are under pressure to do so as efficiently and speedily as they can, while still accomplishing just outcomes in every civil action. … Necessarily, they must have substantial discretion as they manage their dockets.");

*Shine v. Owens-Ill., Inc.*, 979 F.2d 93, 96 (7th Cir. 1992) ("[J]udges must be able to enforce deadlines.").

Consistent with the local rules, JCI filed a Local Rule 56.1(a)(3) statement of undisputed facts along with its summary judgment motion. Doc. 53. Each factual assertion in the Local Rule 56.1(a)(3) statement cites evidentiary material in the record and is supported by the cited material. *See* N.D. Ill. L.R. 56.1(a) ("The statement referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph."). The Seventh Circuit "has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Flint*, 791 F.3d at 767 (citing cases); *see also Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules.") (internal quotation marks omitted). Here, the problem is not that Zegarra did not *strictly* comply with Local Rule 56.1, but rather that he did not comply *at all*. He did not file any response materials—no brief, no Local Rule 56.1(b)(3)(B) response to JCI's Local Rule 56.1(a)(3) statement, and no Local Rule 56.1(b)(3)(C) statement of additional facts. Accordingly, the court accepts as true the facts set forth in JCI's Local Rule 56.1(a)(3) statement. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) ("When a responding party's statement fails to dispute the facts set

forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion."); *Parra v. Neal*, 614 F.3d 635, 636 (7th Cir. 2010); *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 393 (7th Cir. 2009); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006); *Raymond*, 442 F.3d at 608.

That said, the court is mindful that "a nonmovant's failure to … comply with Local Rule 56.1 … does not … automatically result in judgment for the movant. … [The movant] must still demonstrate that it is entitled to judgment as a matter of law." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). The court therefore will recite the facts in JCI's Local Rule 56.1(a)(3) statement and then determine whether, on those facts, JCI is entitled to summary judgment. The court sets forth the following facts as favorably to Zegarra, the non-movant, as the record and Local Rule 56.1 allow. *See Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015). In considering JCI's motion, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am.*, 805 F.3d 278, 281 (7th Cir. 2015).

JCI manufactures, sells, and services engineered sealing systems for industrial markets. Doc. 53 at ¶ 3. Zegarra worked for JCI from December 19, 1988 through April 24, 2013. *Id*. at ¶ 1. During 2012 and 2013, Zegarra worked in JCI's Central Parts Warehouse. *Id*. at ¶¶ 5, 7. His primary job duties involved printing sales orders from a computer and placing them in designated buckets so that "pickers" could grab the orders and select parts. *Id*. at ¶ 6. Zegarra was the only employee in the Central Parts Warehouse with that primary duty. *Id*. at ¶ 7. Zegarra's race is Hispanic/Latino, his color is non-white, and his national origin is Peruvian. *Id*. at ¶ 2. At the time of his termination, Zegarra was 44 years old. *Ibid*.

JCI's employee handbook outlines a three-step discipline process: (1) a written warning that "remains active in an employee's personnel file" for twelve months; (2) a final warning; and

(3) termination.  *Id*. at ¶¶ 17-18.  The handbook sets forth an "Employee Appeal Procedure" that permits employees to address workplace complaints with their supervisor, their supervisor's boss, the human resources department, and more senior leaders.  *Id*. at ¶ 26.  Zegarra acknowledged at his deposition that he received the handbook during the relevant time period; he did not recall seeing the Employee Appeal Procedure, but acknowledged that it was contained in the handbook that he received.  *Id*. at ¶¶ 16, 27.

On or about April 27, 2012, Jerry LaVigne, JCI's Manager of Warehouse and Logistics, spoke to Zegarra and issued him a written warning for having not worn "personal protective equipment" on at least eight occasions over the preceding eight months.  *Id*. at ¶¶ 10, 19, 21.  LaVigne issued the warning because Zegarra did not wear safety glasses and safety shoes in the warehouse.  *Id*. at ¶ 20.  Zegarra did not appeal the warning.  *Id*. at ¶ 28.

To anonymously report unsafe acts or work rules violations, JCI employees may use a "Hazard Identification Ticket" ("HIT").  *Id*. at ¶ 29.  In April 2013, JCI received two HITs asserting that Zegarra was viewing pornography on his work computer during work hours.  *Id*. at ¶ 30.  Because JCI's Internet Access Policy forbids employees from using the internet to view sites containing sexually explicit material, LaVigne and Joe Vitetta, a shop floor supervisor in the Central Parts Warehouse, commenced an investigation.  *Id*. at ¶¶ 13, 31, 40.  Brett Zumsteg, an information technology specialist at JCI, reviewed the websites that Zegarra had visited and the images that he had viewed to determine if the HITs' allegations were true.  *Id*. at ¶ 32.  Based on Zumsteg's investigation, JCI concluded that Zegarra had accessed Craigslist.com, raising the possibility that he had viewed explicit images on his work computer.  *Id*. at ¶ 33.

Zegarra admitted that he viewed sexually explicit images on his work computer on multiple occasions, but contended that he did so unintentionally because the images would "pop

up" on his computer screen. *Id*. at ¶¶ 35, 37-38. JCI's Internet Access Policy does not excuse the unintended viewing of sexually explicit material. *Id*. at ¶ 40. On or about April 12, 2013, LaVigne and Vitetta met with Zegarra to discuss the results of their investigation. *Id*. at ¶ 39. At the meeting, Zegarra was upset and threatened to "clean house." *Ibid*.

On April 16, 2013, Zegarra told Liway Irvin, a female coworker, that he would need to "strip search" her. *Id*. at ¶ 41. Irvin was offended by the comment—which Zegarra contends was a joke—and asked him to stop. *Id*. at ¶¶ 42-43. JCI's Sexual Harassment Avoidance Policy states that sexual harassment can include "teasing and joking." *Id*. at ¶ 44.

On April 23, 2013, with the April 27, 2012 written warning still in Zegarra's file, Vitetta issued Zegarra a final warning for willfully refusing to follow his instructions about printing sales orders and putting them in designated areas before leaving work each day, and also for distributing work to pickers, which was not part of his job. *Id*. at ¶¶ 22, 24. Prior to that warning, Zegarra had been counseled several times to place orders in designated areas before leaving work for the day. *Id*. at ¶ 23.

As a cumulative result of these events—violations of the internet access and sexual harassment policies, and the final warning for insubordination—JCI terminated Zegarra on April 24, 2013. *Id*. at ¶¶ 48-51. LaVigne initially recommended Zegarra's termination; Vitetta and Cindy Majkowicz, JCI's Operations Manager and LaVigne's direct supervisor, were "involved" as well, and Erika Barrera, a Human Resources Generalist at JCI, reviewed and approved the request for termination. *Id*. at ¶¶ 8, 11, 46-47.

On February 28, 2014, 300 days after his termination, Zegarra filed a charge with the EEOC, alleging discrimination and termination based on age, color, national origin, and race. *Id*. at ¶ 52; Doc. 53-3. As for age discrimination, Zegarra contended at his deposition that other "40

plussers" were terminated, including his former colleagues Raman Betgraviel and Amir Hermiz, although neither told Zegarra that age was the reason for their terminations. Doc. 53 at ¶¶ 54-55. Zegarra acknowledged at his deposition that nobody at JCI made any age-related comments to him, but he asserts that Danielle Lambert and Scott Peele were similarly situated younger employees who were not terminated. *Id*. at ¶¶ 56, 60. Zegarra indicated that he believed that Lambert received favorable treatment because she was (Zegarra believed) in a romantic relationship with LaVigne, and that Peele received favorable treatment because he and LaVigne were friends. *Id*. at ¶¶ 57-59. On May 23, 2013, a month after Zegarra's termination, JCI terminated Lambert for violating work rules, interfering with production, and engaging in horseplay. *Id*. at ¶ 61.

With respect to color, race, and national origin discrimination, Zegarra contends that Lambert and Peele are white, non-Hispanic/Latino, and non-Peruvian comparators who should have been terminated based on their alleged violations of JCI's rules of conduct. *Id*. at ¶ 70. Zegarra further contends that discrimination resulted in his being regularly denied the chance to work overtime from roughly May 1, 2012 until his April 24, 2013 termination. *Id*. at ¶ 63. JCI assigns overtime based on departmental need; if the Central Parts Warehouse is behind in a particular area, employees who work in that area are asked to work overtime. *Id*. at ¶ 65. Only if additional employees are required are volunteers from other departments considered. *Ibid*. Zegarra asserts that "a lot of times" he would arrive to work on a Monday to find that other employees had worked overtime over the weekend. *Id*. at ¶ 64. He also asserts that "the majority of Spanish people weren't getting overtime and whites were." *Id*. at ¶ 69.

From May 1, 2012 through his termination, Zegarra worked 274.4 overtime hours. Doc. 53-20 at 18-19, 39. Over the same time period, Lambert worked more overtime (315.5 hours)

than Zegarra did, and Peele worked slightly less (262.3 hours).  *Id*. at 11-12, 15, 33, 35-36.  This pattern was a partial reversal from the first four months of 2012, when Zegarra worked 91.5 overtime hours, Lambert worked 35.2 overtime hours, and Peele worked 22.1 overtime hours. *Id*. at 11-12, 15, 18-19.

Zegarra alleges that on six occasions in 2012 and two occasions in 2013, he was subject to retaliation for complaining to LaVigne about being denied overtime, and that his termination was in retaliation for those complaints.  Doc. 53 at ¶¶ 76, 78.  According to Zegarra, the retaliation consisted of the further denial of overtime hours and the "constant looking over [Zegarra's] shoulder about work and sales order[s]."  *Id*. at ¶ 77.  Zegarra did not complain to human resources or file an employee appeal concerning his belief that he was denied overtime for discriminatory reasons.  *Id*. at ¶ 79.  LaVigne acknowledges that Zegarra spoke to him about the assignment of overtime, but he does not recall Zegarra complaining that he was denied overtime because of his race.  *Id*. at ¶ 80.

Zegarra alleges that beginning in 2012 and continuing into 2013, he experienced a hostile work environment based on his race, color, and national origin.  *Id*. at ¶¶ 71, 74.  According to Zegarra, LaVigne would pull Zegarra aside to tell him that someone "is complaining about [Zegarra] not doing this or doing this" and to "be more careful."  *Id*. at ¶ 72.  Zegarra alleges that although LaVigne pulled Zegarra aside "maybe a handful of times" in 2012, those interactions "became such a constant thing that work became a very stressful place to be …."  *Id*. at ¶¶ 72-74. Zegarra never complained to human resources or filed an employee appeal with respect to the allegedly hostile work environment.  *Id*. at ¶ 75.

**Discussion**

The complaint alleges that JCI discriminated against Zegarra on account of his age, race, color, and national origin by terminating him (Counts I-III); denied him overtime and subjected him to a hostile work environment on account of his race, color, and national origin (Count IV); and retaliated against him for complaining about the allegedly discriminatory denial of overtime (Count V). Doc. 1. As noted, JCI seeks summary judgment on all claims. Doc. 51.

**I.      Failure to Exhaust Administrative Remedies for Certain Title VII Claims**

As a threshold issue, JCI seeks summary judgment on three of Zegarra's Title VII claims—discriminatory denial of overtime, retaliatory denial of overtime, and hostile work environment—on the ground that he failed to exhaust his administrative remedies. Doc. 54 at 11, 19-20, 24-25. A plaintiff in Illinois who wishes to bring a Title VII claim in federal court must first file an administrative charge with the EEOC within 300 days of the alleged unlawful employment practice's occurrence. *See* 42 U.S.C. § 2000e–5(e); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014); *Hentosh v. Herman M. Finch Univ. of Health Scis./The Chi. Med. Sch.*, 167 F.3d 1170, 1173 (7th Cir. 1999); *Lorance v. AT&T Techs., Inc.*, 827 F.2d 163, 165-66 (7th Cir. 1987), *aff'd*, 490 U.S. 900 (1989). Failure to file a charge within that time renders the claim untimely. *See Hentosh*, 167 F.3d at 1174. The plaintiff must present in the EEOC charge any claim he later wants to pursue in federal court. *See McKenzie v. Ill. Dep't of Transp.,* 92 F.3d 473, 481 (7th Cir. 1996) ("Generally, a Title VII plaintiff may bring only those claims that were included in her EEOC charge …."). This exhaustion requirement "serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion, and of giving the employe[r] some warning of the conduct about which the employee is aggrieved .… For allowing a complaint to

9

encompass allegations outside the ambit of the predicate EEOC charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (citation omitted).

"For a plaintiff to proceed on a claim not raised in an EEOC charge, there must be a reasonable relationship between the allegations in the charge and the claims in the complaint, and it must appear that the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Jones v. Res-Care, Inc.*, 613 F.3d 665, 670 (7th Cir. 2010) (internal quotation marks omitted). Such unraised claims must be "like or reasonably related to the administrative charges." *Reynolds v. Tangherlini*, 737 F.3d 1093, 1102 (7th Cir. 2013) (internal quotation marks omitted).

Zegarra brought his EEOC charge on February 28, 2014, 300 days after his termination. Doc. 53 at ¶ 52; Doc. 53-3. The charge alleged discriminatory termination on account of his age, race, color, and national origin; denial of overtime on account of his race, color, and national origin; a hostile work environment based on his race, color, and national origin; and retaliatory termination for complaining about the allegedly discriminatory denial of overtime. Doc. 53-3. JCI contends that the hostile work environment and discriminatory denial of overtime claims are barred because the EEOC charge was filed 300 days after Zegarra's termination, and the denial of overtime and hostile work environment necessarily preceded the termination. Doc. 54 at 24-25. There is no need to run JCI's argument to ground because those two claims, even if timely, fail on the merits, as shown in Parts II.A and II.B below.

JCI also contends that Zegarra did not exhaust his retaliatory denial of overtime claim because his EEOC charge alleged only discriminatory denial of overtime. Doc. 53-3 at 6; Doc. 54 at 11, 24-25. JCI is correct. "Courts review the scope of an EEOC charge liberally," *Huri v.*

*Office of the Chief Judge of the Circuit Court of Cook Cnty.*, 804 F.3d 826, 831 (7th Cir. 2015), but settled precedent holds that allegations of *discrimination* in an EEOC charge are not like or reasonably related to allegations of *retaliation*, and therefore are not sufficient to support a retaliation claim. *See Swearingen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 864-65 (7th Cir. 2010) ("Normally, retaliation and discrimination charges are not considered like or reasonably related to one another.") (internal quotation marks omitted); *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003) ("Normally, retaliation, sex discrimination, and sexual harassment charges are not 'like or reasonably related' to one another to permit an EEOC charge of one type of wrong to support a subsequent civil suit for another."); *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 550 (7th Cir. 2002) ("We do not believe that Mr. Peters' retaliation claim is like or reasonably related to this discrimination charge. Critical to a prima facie case of retaliation is that the plaintiff engaged in protected activity, such as the filing of a charge of discrimination or other complaint of discriminatory activity. However, the charge makes no mention of a complaint of discrimination, to whom the complaint was made or what adverse action allegedly resulted from the complaint. Furthermore, although given the option to check the box on the charge form indicating retaliation, Mr. Peters did not do so. Keeping in mind that one of the purposes of the charge is to alert the employer to the offending behavior, we believe that Mr. Peters' failure to mention any type of protected activity and his failure to identify retaliation as a basis for his charge preclude him from relying on the original charge of discrimination as a basis for his retaliation claim.") (internal citation omitted). Because Zegarra's EEOC charge alleges only the discriminatory denial of overtime and not the retaliatory denial of overtime, *compare* Doc. 53-3 at 2-4 *with id.* at 4-5, he failed to exhaust his retaliatory denial of overtime claim. *See Reynolds*, 737 F.3d at 1100-01 (holding that the

plaintiff failed to exhaust his retaliation claim where his EEOC charge alleged only discrimination); *Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 716 (7th Cir. 2006) (same as *Reynolds*), *overruled on other grounds as noted in EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 777 (7th Cir. 2007).

The Seventh Circuit has carved a limited exception to the exhaustion requirement for retaliation claims, holding that "a separate administrative charge is not prerequisite to a suit complaining about retaliation for filing the first [EEOC] charge." *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir. 1989); *see also Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1030 (7th Cir. 2013); *Horton v. Jackson Cnty. Bd. of Cnty. Comm'rs*, 343 F.3d 897, 898 (7th Cir. 2003) ("[R]etaliation for complaining to the EEOC need not be charged separately from the discrimination that gave rise to the complaint, at least … if the person discriminated against and the person retaliated against are the same.") (citations omitted); *Gawley v. Ind. Univ.*, 276 F.3d 301, 314 n.8 (7th Cir. 2001) ("Of course, an employee is not required to file a separate EEOC charge alleging retaliation when the retaliation occurs in response to the filing of the original EEOC charge."); *Heuer v. Weil-McLain,* 203 F.3d 1021, 1023 (7th Cir. 2000) (same); *McKenzie*, 92 F.3d at 482 (holding that a plaintiff may bring suit on a retaliation claim not included in his administrative charge "where the alleged retaliation arose after the charge of discrimination had been filed") (quoting *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 545 n.2 (7th Cir. 1988)). The rationale for this exception is that requiring a plaintiff to bring a second EEOC charge alleging retaliation for filing a first EEOC charge "would mean that two charges would have to be filed in a retaliation case—a double filing that would serve no purpose except to create additional procedural technicalities when a single filing would comply with the intent of Title VII." *McKenzie*, 92 F.3d at 482.

Consistent with this rationale, the Seventh Circuit has held that the exception does *not* apply to claims based on alleged retaliatory acts committed *before* the plaintiff's filing of an EEOC charge, since such retaliation could be alleged in the initial charge and therefore would not require a "needless" second charge. *Id*. at 482-83. As the Seventh Circuit explained:

> In this case, Ms. McKenzie alleges several retaliatory acts, and two of those acts occurred prior to her filing of her original EEOC charge. Yet Ms. McKenzie did not mention her claims of retaliation in either her original charge against IDOT or her amended charge filed several months later. Because each of those incidents of retaliation could have been—and should have been—included in her administrative charges, they cannot now serve as the basis of the retaliation claim alleged in her complaint.

*Id*. at 483. Here, Zegarra did not file his EEOC charge until 300 days after his allegedly retaliatory termination, so the exception to the ordinary exhaustion rule does not apply. Accordingly, Zegarra's retaliatory denial of overtime claim was not exhausted, and JCI is entitled to summary judgment on that claim.

## II.      Title VII Discrimination Claims

Zegarra alleges that he suffered various forms of discrimination on account of his race, color, and national origin. Until very recently, plaintiffs in the Seventh Circuit could avoid summary judgment in Title VII discrimination cases by making one of two showings. *See*, *e.g.*, *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016); *Carothers v. Cnty. of Cook*, 808 F.3d 1140, 1148-49 (7th Cir. 2015). First, a plaintiff could attempt to satisfy the so-called "direct method" of proof; under that method, the court would evaluate whether the plaintiff had "present[ed] sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Harper v. Fulton Cnty.*, 748 F.3d 761, 765 (7th Cir. 2014); *see also Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). Second, a plaintiff could avoid summary judgment by satisfying the so-called "indirect method" of proof. First described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the

indirect method allows the plaintiff to shift the burden of proof on the question of intent to the defendant once the plaintiff makes certain showings. *See id*. at 802. Specifically, the plaintiff first has to make a *prima facie* case, showing that "(1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment." *Kuttner v. Zaruba*, 819 F.3d 970, 976 (7th Cir. 2016). If the plaintiff makes her *prima facie* case, the burden shifts to the defendant to give a non-discriminatory reason for treating the plaintiff the way it did, and if the defendant meets *its* burden, the burden shifts back to the plaintiff to show that the defendant's explanation is not pretextual. *See McDonnell Douglas*, 411 U.S. at 802, 804.

That was the old way. The Seventh Circuit recently issued an opinion in *Ortiz v. Werner Enterprises, Inc.*, __ F.3d __, 2016 WL 4411434 (7th Cir. Aug. 19, 2016), which rejected the distinction between the direct and indirect methods, stating that "[t]he time has come to jettison these diversions and refocus analysis on the substantive legal issue." *Id*. at *3. The substantive legal issue in *Ortiz* was "[w]hether a reasonable juror could conclude that Ortiz would have kept his job if he had a different ethnicity, and everything else had remained the same." *Ibid*. The district court appeared to have considered some evidence under the "direct method" but not under the "indirect method," and vice versa, *id.* at *2-3, and the Seventh Circuit held that to be reversible error, *id*. at *4. In the process, the Seventh Circuit explicitly overruled numerous precedents "to the extent that these opinions insist on the use of the direct-and-indirect framework." *Id*. at *5 (overruling *Andrews v. CBOCS W., Inc.*, 743 F.3d 230 (7th Cir. 2014); *Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729 (7th Cir. 2011); *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487 (7th Cir. 2007); *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498 (7th Cir. 2004);

*Haywood v. Lucent Techs., Inc.*, 323 F.3d 524 (7th Cir. 2003); *Oest v. Ill. Dep't of Corrs.*, 240 F.3d 605 (7th Cir. 2001); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612 (7th Cir. 2000); *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391 (7th Cir. 1997); *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359 (7th Cir. 1988); and *La Montagne v. Am. Convenience Prods., Inc.*, 750 F.2d 1405 (7th Cir. 1984)).  *Ortiz* also explicitly overruled precedents that instructed district courts to determine under the direct method whether the plaintiff had presented a "convincing mosaic" of circumstantial evidence.  *Id.* at *4 (overruling, to the extent they relied on the "convincing mosaic" rule, *Hatcher v. Bd. of Trs. of S. Ill. Univ.*, 829 F.3d 531 (7th Cir. 2016); *Chaib v. Indiana*, 744 F.3d 974 (7th Cir. 2014); *Cloe v. Indianapolis*, 712 F.3d 1171 (7th Cir. 2013); *Smith v. Bray*, 681 F.3d 888 (7th Cir. 2012); *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670 (7th Cir. 2012); *Silverman*, 637 F.3d at 729; *Phelan v. Cook Cnty.*, 463 F.3d 773 (7th Cir. 2006); *Koszola v. Bd. of Educ. of Chi.*, 385 F.3d 1104 (7th Cir. 2004); *Rhodes*, 359 F.3d at 498; *Cerutti v. BASF Corp.*, 349 F.3d 1055 (7th Cir. 2003); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081 (7th Cir. 2000)).  *Ortiz* makes clear, though, that it does not undermine "[t]he burden-shifting framework created by *McDonnell Douglas*," explaining:

> Today's decision does not concern *McDonnell Douglas* or any other burden-shifting framework, no matter what it is called as a shorthand.  We are instead concerned about the proposition that evidence must be sorted into different piles, labeled "direct" and "indirect," that are evaluated differently.  Instead, all evidence belongs in a single pile and must be evaluated as a whole.  That conclusion is consistent with *McDonnell Douglas* and its successors.

*Ortiz*, 2016 WL 4411434 at *5.

To survive summary judgment, then, a plaintiff must present evidence that, considered as a whole, would allow a reasonable juror to conclude that the plaintiff was discriminated against due to a protected characteristic, suffering an adverse employment action.  *McDonnell Douglas* identifies one pattern that the evidence might fit that would enable a reasonable juror to find

15

discrimination—namely, a pattern of evidence showing that the plaintiff belonged to a protected class, met her employer's legitimate expectations, suffered an adverse employment action, and was similarly situated to other employees who were not members of the protected class and who were treated better, provided that the defendant fails to articulate a reasonable alternative explanation or the plaintiff shows that the defendant's proffered alternative explanation is a pretext. But the pattern identified in *McDonnell Douglas* is just one way that the record evidence could enable a reasonable juror to find discrimination. A district court must not limit its analysis to *McDonnell Douglas* or treat some evidence as relevant to the *McDonnell Douglas* analysis but not to the broader question whether "a reasonable factfinder [could] conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id*. at *4.

A.      **Denial of Overtime**

Zegarra alleges that from May 1, 2012 through his April 24, 2013 termination, he was regularly denied the opportunity to work overtime. Doc. 1 at ¶¶ 10, 48. At his deposition, Zegarra maintained that Lambert and Peele were white, non-Hispanic/Latino, and non-Peruvian employees who did not suffer reduced overtime, and also that "the majority of Spanish people weren't getting overtime and whites were …." Doc. 53 at ¶¶ 69-70. As noted above, from May 1, 2012 through his termination, Zegarra worked 274.4 overtime hours. Doc. 53-20 at 18-19, 39. Over the same period, Lambert worked more overtime (315.5 hours) than did Zegarra, and Peele worked slightly less (262.3 hours). *Id*. at 11-12, 15, 33, 35-36. That partially reversed the pattern from the first four months of 2012, when Zegarra worked 91.5 overtime hours, Lambert 35.2 overtime hours, and Peele 22.1 overtime hours. *Id*. at 11-12, 15, 18-19.

Under certain circumstances, lost overtime may be considered a materially adverse employment action. *See Henry v. Milwaukee Cnty.*, 539 F.3d 573, 585 (7th Cir. 2008); *Lewis v. City of Chicago*, 496 F.3d 645, 653-54 (7th Cir. 2007). JCI argues, however, that the record does not support Zegarra's submission that he was actually denied overtime that he would have received absent discrimination. Doc. 54 at 6-7, 24. It is Zegarra's burden to adduce such evidence. *See Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014) (noting that once a moving party has made a showing "that there is an absence of evidence to support the nonmoving party's case[,] … the non-movant … must demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [its] favor") (citations and internal quotation marks omitted). This Zegarra has not done.

Although Zegarra worked more overtime than his two alleged comparators in the first four months of 2012, but more than only one of his alleged comparators over the next twelve months, those first four months were an anomaly. Zegarra worked 65 hours of overtime combined in the periods leading up to the following pay dates: January 20, 2012 (20 hours), January 27, 2012 (20 hours), and February 3, 2012 (25 hours). Doc. 53-20 at 18. That level was atypical for Zegarra, whose next highest week of overtime prior to May 1, 2012 was 9.3 hours; it also was atypical for the other forty-three employees who worked in his department during the relevant time period, only five of whom had even a single week in 2012 or 2013 with at least twenty overtime hours. *Id*. at 5, 7-8, 10, 18, 23, 25-26, 30, 32. Zegarra thus adduces no evidence that the high levels of overtime he enjoyed during the first four months of 2012 were typical for him; that the 274.4 overtime hours he worked from May 1, 2012 through his termination represented a reduction from his overtime hours over a comparable time period; or, even if they did represent a reduction, that the reduction was of such magnitude as to show

discriminatory animus. At his deposition, Zegarra articulated his belief that "the majority of Spanish people weren't getting overtime and whites were," Doc. 53 at ¶ 69, but he has offered no evidence to back up his belief. And because Zegarra "provides no evidence, statistical or otherwise, to corroborate his belief" that he suffered a discriminatory denial of overtime, *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009), JCI is entitled to summary judgment on the merits as to that claim. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 548 (7th Cir. 2011) ("If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed.").

### B.    Hostile Work Environment

A hostile work environment qualifies as a materially adverse employment action. *See Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 745 (7th Cir. 2002) (holding that materially adverse employment actions include "cases of harassment-mistreatment of an employee by coworkers or supervisors that is sufficiently severe to worsen substantially his conditions of employment as they would be perceived by a reasonable person in the position of the employee") (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 786-88 (1998)). "Surviving summary judgment on a hostile work environment claim requires sufficient evidence demonstrating (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016).

The third element "is in the disjunctive—the conduct must be *either* severe *or* pervasive." *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011), *aff'd*, 133 S. Ct. 2434 (2013). This

means that "one extremely serious act of harassment could rise to an actionable level[,] as could a series of less severe acts." *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013). A court addressing whether a work environment is hostile must consider "factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss*, 816 F.3d at 920. In so doing, the court must bear in mind that Title VII does not impose a "general civility code" in the workplace and that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S.at 788 (citation and internal quotation marks omitted); *see also McPherson v. City of Waukegan*, 379 F.3d 430, 438-39 (7th Cir. 2004). A workplace presents an objectively hostile work environment if it is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014).

Zegarra has not adduced evidence sufficient to support his hostile work environment claim. The complaint alleges that Zegarra was "written-up" two or three times per month from November 1, 2012 until his April 24, 2013 termination. Doc. 1 at ¶ 50. The record does not support that allegation; Zegarra asserted at his deposition that LaVigne harassed him "maybe a handful of times" by telling him that somebody was complaining about him, by warning him that he should "be more careful," and by "nitpicking" his work, including by reminding him to wear personal protective equipment. Doc. 53 at ¶¶ 71-74; Doc. 53-8 at 38. As a result, Zegarra testified, "work became a very stressful place" for him. Doc. 53 at ¶ 73.

Zegarra has not specified the precise times when LaVigne's alleged harassment occurred, but the more important point is that he has not demonstrated that it was severe or pervasive throughout *any* discernible period or that any of LaVigne's actions qualifies as an "extremely serious act of harassment." *Hall*, 713 F.3d at 330. There is no evidence that Zegarra's and LaVigne's interactions occurred with such regularity that they altered the terms and conditions of Zegarra's employment. Nor does the record indicate that those interactions interfered at all, much less unreasonably so, with Zegarra's work performance. *See Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (affirming summary judgment for the defendant on a hostile work environment claim, reasoning that the plaintiff offered no proof that she "was unable to perform her job because of the conduct of her supervisors and co-workers"). To the contrary, Zegarra's duties and position remained the same; he was not demoted or suspended; he did not complain to human resources or file an employee appeal, Doc. 53 at ¶ 75; and he remained at JCI without incident or complaint (on his part) until his termination. At most, Zegarra alleges "normal workplace friction." *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004). Accordingly, because the acts of which Zegarra complains are not objectively severe or pervasive, they cannot support a hostile work environment claim.

An independent ground for summary judgment is that Zegarra "offers no evidence that the alleged harassment was based on his race," color, or national origin. *Id*. at 302. "While it is true that harassment need not be *explicitly* racial in order to be probative of a hostile environment, it is equally true that not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 863 (7th Cir. 2005). Zegarra has adduced no evidence that LaVigne's alleged "nitpicking" of his work performance

was in any way related to his race, color, or national origin.  Zegarra acknowledges that neither LaVigne nor anyone else at JCI made discriminatory comments to him about his characteristics, Doc. 53 at ¶ 69, and "[t]here is no inherently racial component to an employer providing an employee" with criticism, much less constructive criticism about workplace protocol and safety. *Beamon*, 411 F.3d at 863.  For this reason as well, JCI is entitled to summary judgment on the hostile work environment claim.

C.      **Termination**

Zegarra maintains that JCI terminated him on account of his race, color, and national origin.  Doc. 1 at ¶¶ 29-45, 59-67.  However, he offers no evidence that anybody at JCI bore animus toward him due to those characteristics or that his termination resulted from such animus.

Zegarra allowed at his deposition that he "couldn't tell you what John Crane's reasoning" was for his termination and that no one at JCI made discriminatory comments to him about his ethnicity or national origin.  Doc. 53 at ¶ 69.  Other than his subjective beliefs, Zegarra adduces no direct or circumstantial evidence that anyone at JCI, much less anyone with decisionmaking authority over his employment, bore racial, color-based, or national origin-based animus toward him.  *See Yancick*, 653 F.3d at 548.  Likewise, none of the events related to Zegarra's termination "point[] directly to a discriminatory [or retaliatory] reason" for his firing, *Carothers*, 808 F.3d at 1149, and he has adduced no evidence suggesting a pretextual explanation.  Zegarra has provided no evidence that his termination resulted from discrimination.

Zegarra also cannot forestall summary judgment by framing his claim under *McDonnell Douglas*.  First, he has not shown that he met JCI's legitimate job expectations.  *See Kuttner*, 819 F.3d at 976.  To the contrary, in his final weeks at JCI, Zegarra repeatedly viewed sexually explicit images on his work computer, in violation of JCI's internet policy; violated JCI's sexual

harassment policy by telling Irvin that he would "strip search" her; and received his final warning for insubordination after failing to follow Vitetta's instructions and attempting to perform duties not associated with his role. Zegarra does not dispute any of these matters, and although he proposes justifications—claiming that his viewing of sexually explicit material was accidental and that his comment to Irvin was a harmless joke, even though JCI's internet use policy forbids even unintentional viewing of explicit material and its sexual harassment policy includes jokes, Doc. 53 at ¶¶ 35, 37-38, 40, 42—"his admission to the conduct at issue prevents him from establishing that he was meeting [JCI's] legitimate expectations." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 666 (7th Cir. 2006). This prevents Zegarra from making a prima facie case under *McDonnell Douglas*.

Nor does any evidence show that JCI favored white, non-Hispanic/Latino, or non-Peruvian employees similarly situated to Zegarra. "Similarly situated employees must be directly comparable to the plaintiff in all material respects," but they need not be "clones." *Coleman*, 667 F.3d at 846 (internal quotation marks and alteration omitted); *see also Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015). As a general rule, the plaintiff must show that a comparator "(1) dealt with the same supervisor, (2) was subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish his conduct or the employer's treatment of him." *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014) (alterations and internal quotation marks omitted). At his deposition, Zegarra identified Lambert and Peele as comparators, but on summary judgment he adduces no evidence that would allow a reasonable jury to find that Peele was similarly situated to him or that Lambert was treated more favorably than he was.

First, Zegarra provides no evidence whatsoever about Peele's performance at JCI, much less evidence suggesting that Peele's performance was comparable to Zegarra's. There is no evidence that Peele received written or final warnings, violated any workplace policies, or was insubordinate. That defeats Zegarra's submission that Peele was a similarly situated employee. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012) ("Mr. Harper failed to identify any other instructor who had a comparable attendance record, and his argument with respect to the disparities in C.R. England's treatment of its employees is therefore unsupported by the record."); *Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008) ("[Argyropoulos] has not identified any other employee who engaged in comparable misconduct. … Only if the other employee had engaged in similar misconduct while employed by the City would this employee possibly serve as a useful comparator. Argyropoulos also points out that Duty's job performance had been criticized, but those criticisms did not identify any misconduct remotely similar to [Argyropoulos's].") (emphasis omitted); *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330-31 (7th Cir. 2002) ("Country Mutual's criticisms of Mason and Dempski pale in comparison to those lodged by the company against Peele (i.e., nine critical written evaluations in 18 months …) and therefore neither is similarly situated to [Peele] ….."); *Oest*, 240 F.3d at 614 ("We … have upheld the entry of summary judgment against a Title VII plaintiff who has presented only his own uncorroborated, conclusory statements that similarly situated co-workers were treated differently.").

As for Lambert, she was terminated a month after Zegarra for her own violations of JCI's rules. JCI contends that "[i]t is impossible to distinguish the way John Crane addressed Lambert's workplace misconduct from [Zegarra's] in light of the fact that she was terminated at the same time." Doc. 54 at 17. That is not quite right; Lambert was terminated seven months

after receiving her final warning on October 22, 2012, while Zegarra was terminated only one day after receiving his final warning. Doc. 53 at ¶¶ 1, 22, 61. But Zegarra has not argued or adduced any evidence to demonstrate that this difference in timing was meaningful or, even if it were, that the difference was in any way related to his race, ethnicity, or national origin. To the contrary, Zegarra testified at his deposition that he believed that LaVigne protected Lambert because the two were allegedly in a romantic relationship. Doc. 53 at ¶¶ 57-58. That explanation does not support Zegarra's claim that his termination was discriminatory. Furthermore, because "a court does not sit as a super-personnel department, second-guessing an employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation," *Coleman*, 667 F.3d at 862 (internal quotation marks omitted); *see also Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 895 (7th Cir. 2016) (same), the difference in timing between their respective final warnings and terminations does not, without more, show that Lambert received more favorable treatment than did Zegarra. JCI is thus entitled to summary judgment on Zegarra's Title VII discriminatory termination claim.

## III.    ADEA Discrimination Claims

The complaint alleges that JCI intentionally discriminated against Zegarra on account of his age by terminating him. Doc. 1 at ¶¶ 22-28. ADEA claims are analyzed under the same framework as Title VII claims. *See Nagle*, 554 F.3d at 1114 n.3 ("We apply the same analytical framework to employment discrimination cases whether they are brought under the ADEA or Title VII."). *Ortiz* was a Title VII case, but nothing in the opinion alters the principle that ADEA claims and Title VII claims should be approached under the same analytical framework. *See Owens v. Bd. of Educ. of Chi.*, 2016 WL 4611387, *3 (N.D. Ill. Sept. 6, 2016); *Peck v. Kelly Servs., Inc.*, 2016 WL 4591904, *2-3 (N.D. Ill. Sept. 2, 2016). Accordingly, for his age

discrimination claims, Zegarra may defeat summary judgment by presenting evidence that, considered as a whole, would allow a reasonable juror to conclude that the plaintiff was discriminated against due to a protected characteristic, suffering an adverse employment action. *See Ortiz*, 2016 WL 4411434 at *4.

Zegarra has not met this burden. He offers no evidence of pretext or suspicious timing, and he acknowledged at his deposition that no one at JCI made any age-related comments to him. Doc. 53 at ¶ 60. He rests his claim on the allegation that some other employees over forty years of age, including Betgraviel and Hermiz, were terminated. *Id*. at ¶¶ 54-55. But although circumstantial evidence need not be "rigorously statistical" to show discriminatory animus, a plaintiff must demonstrate that "*similarly-situated* employees outside the protected class received *systematically* better treatment." *Boss*, 816 F.3d at 916-17 (emphasis added). Zegarra alleges only that Lambert and Peele were similarly situated younger employees who were not terminated. Doc. 53 at ¶ 56. As discussed above, however, the evidence would not allow a reasonable factfinder to conclude that Peele was similarly situated to Zegarra or that Lambert received better treatment.

*McDonnell Douglas* is unhelpful to Zegarra's ADEA claim for the same reasons that it does not save his Title VII claim: he was not meeting JCI's legitimate expectations, and he has not demonstrated that similarly situated employees received more favorable treatment. Even assuming for the sake of argument that Lambert and Peele were similarly situated, Zegarra *himself* has provided explanations—Peele's purported friendship with LaVigne, and Lambert's alleged romantic relationship with LaVigne—for the allegedly more favorable treatment that Peele and Lambert received. Those motivations are not discriminatory under the ADEA. For these reasons, JCI is entitled to summary judgment on Zegarra's ADEA claim.

## IV.    Retaliation Claims

Finally, Zegarra claims that JCI retaliated against him for complaining about the alleged denial of overtime.  Doc. 1 at ¶¶ 59-67.  To forestall summary judgment, Zegarra must present evidence that, considered as a whole, would allow a reasonable juror to conclude that "(1) he engaged in protected activity; (2) he suffered a materially adverse employment action; and (3) there was a causal link between the protected activity and the adverse action."  *Boss*, 816 F.3d at 918.  Because *Ortiz* does not remove the *McDonnell Douglas* framework from the set of means by which a plaintiff may defeat summary judgment, *see Ortiz*, 2016 WL 4411434 at *5, Zegarra may attempt to meet this burden by showing that in addition to engaging in protected activity and suffering a materially adverse employment action, "he was meeting his employer's legitimate expectations; and … he was treated less favorably than similarly-situated employees who did not engage in protected activity."  *Boss*, 816 F.3d at 918.

Zegarra alleges that on six occasions in 2012 and twice in 2013, JCI retaliated against him for complaining about the allegedly discriminatory denial of overtime.  First, in an echo of his hostile work environment claim, Zegarra alleges that "he received repeated pretextual 'write-ups' … on alleged minor policy violations."  Doc. 1 at ¶ 62.  Second, Zegarra alleges that his termination was retaliatory.  *Id*. at ¶¶ 64-65.  Both allegedly retaliatory actions, he contends, "follow[ed] his involvement in a protected activity within such a period of time [as to] raise[] an inference of retaliatory motivation."  *Id*. at ¶ 66.

### A.    Write-Ups

JCI concedes that Zegarra spoke to LaVigne about the denial of overtime.  Doc. 53 at ¶ 80.  Construed in Zegarra's favor, that evidence suffices to show that Zegarra engaged in protected activity.  Zegarra has not, however, demonstrated that the allegedly pretextual write-

ups were a materially adverse employment action or that they were causally linked to his

protected activity, and nor has he shown that the *McDonnell Douglas* framework offers sufficient

evidence for a jury to find in his favor.

> Adverse actions for purposes of a retaliation claim may include:
>
> > (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1069 (7th Cir. 2012). "To rise to the level of an

adverse action, a change must be one that a reasonable employee would find to be materially

adverse …." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016)

(internal quotation marks omitted). Furthermore, "the action must be more disruptive than a

mere inconvenience or an alteration of job responsibilities." *Porter v. City of Chicago*, 700 F.3d

944, 954 (7th Cir. 2012) (internal quotation marks omitted); *see also Poullard v. McDonald*, 829

F.3d 844, 857 (7th Cir. 2016) ("[N]ot everything that makes an employee unhappy is an

actionable adverse action.") (internal quotation marks omitted). In other words, "an adverse

action must materially alter the terms or conditions of employment to be actionable." *Porter*,

700 F.3d at 954.

Zegarra does not submit that he suffered a change in his pay rate, employment status, or

working conditions, and he provides no evidence about the nature or even the existence of the

write-ups—let alone enough to support on summary judgment the notion that they materially

altered his conditions of employment. Nor does anything other than his subjective belief link the

alleged write-ups to his complaints about the allegedly discriminatory denial of overtime. That is insufficient to forestall summary judgment. *See Yancick*, 653 F.3d at 548.

The *McDonnell Douglas* framework does not help Zegarra because, even if he did engage in protected activity, he once again cannot prove that he was meeting JCI's legitimate expectations or that he was treated less favorably than similarly situated employees. To the extent that the "write-ups" refer to the warnings that Zegarra received for not wearing personal protective equipment in the warehouse, for violating the internet access and sexual harassment policies, or for insubordination, Zegarra's admission to that conduct precludes him from showing that he was meeting JCI's expectations. *See Tomanovich*, 457 F.3d at 666. And Zegarra offers no possible comparators other than Peele and Lambert, who are insufficient for the reasons discussed above and, additionally, because Zegarra has adduced no evidence that they did not engage in protected activity.

**B.     Termination**

Zegarra finds no more success with his retaliatory termination claim. The claim fails under the *McDonnell Douglas* framework for the reasons discussed above—Zegarra was not meeting JCI's legitimate job expectations, and he has identified no similarly situated employees who were treated more favorably. Furthermore, while Zegarra engaged in a protected activity and suffered a materially adverse employment action, he provides no evidence of a causal link between the two.

In his EEOC charge, Zegarra pressed theories based on both pretext and suspicious timing. Doc. 53-3 at 6. Here, he offers no evidence of pretext. As for suspicious timing, Zegarra has adduced no evidence establishing when he engaged in protected activity, although the complaint alleges that he complained "at least once in the two months prior to his

termination" on April 24, 2013. Doc. 1 at ¶ 61. The court need not credit allegations in the complaint as facts on summary judgment, so Zegarra's suspicious timing theory fails. *See Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1041 (7th Cir. 1993) ("Where the party opposing a motion for summary judgment bears the burden of proof on an issue, he may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

But even treating the complaint's allegations as fact, Zegarra's claim still would fail. "Under most circumstances, suspicious timing alone does not create a triable issue on causation," *Hnin v. TOA USA*, 751 F.3d 499, 508 (7th Cir. 2014). While in "egregious cases, suspicious timing alone might create a triable issue on causation," the Seventh Circuit has warned that "it rarely does." *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 389-90 (7th Cir. 2012). The Seventh Circuit has generally found such egregious cases to involve time periods of a few days or, at most, weeks. *See Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314 (7th Cir. 2011) (one day); *Casna v. City of Loves Park*, 574 F.3d 420, 423 (7th Cir. 2009) (four "business days"); *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008) (allowing that "matters occurring within days, or at most, weeks of each other" could satisfy the causation element); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 786-87 (7th Cir. 2007) (protected activity in "late February or early March" and retaliation on March 3); *Spiegla v. Hull*, 371 F.3d 928, 943 (7th Cir. 2004) ("just four days (including the weekend) … [that] came after seven years of [the plaintiff occupying her preferred position]"); *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 797 (7th Cir. 1997) (collecting cases and noting that "[w]e have found the causal nexus sufficiently demonstrated when the time period between the filing of a complaint and the adverse action was … one week"); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312, 1314-15 (7th Cir.

1989) (one week).  Yet Zegarra has not alleged or adduced evidence to demonstrate that his termination came "so close[ly] on the heels of a protected act that an inference of causation is sensible."  *Benuzzi v. Bd. of Educ. of Chi.*, 647 F.3d 652, 665 (7th Cir. 2011).  Having adduced no such evidence, Zegarra cannot proceed on a suspicious timing theory.

## Conclusion

For the foregoing reasons, JCI's summary judgment motion is granted.  Zegarra's claims are dismissed with prejudice, with the exception of the retaliatory denial of overtime claim, which, having been resolved on exhaustion grounds, is dismissed without prejudice.  *See Teal v. Potter*, 559 F.3d 687, 693 (7th Cir. 2009) ("Because Teal failed to exhaust administrative remedies, her complaint must be dismissed without prejudice."); *see also Hill v. Potter*, 352 F.3d 1142, 1145-46 (7th Cir. 2003).  Judgment will be entered in favor of JCI and against Zegarra, and the case will be closed.

October 31, 2016

_____
United States District Judge